IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JEFFREY S.,[1]

    Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

Case No. 17-cv-1299-CJP[2]

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in November 2013, alleging disability as of November 16, 2012. After holding an evidentiary hearing, ALJ Gwen Anderson denied the application on February 2, 2017. (Tr. 15-23). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect his privacy. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 23.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The RFC is inadequate because it is conclusory, not supported by substantial evidence and not supported by any medical evidence that addresses plaintiff's ability to function in the workplace.

2. The ALJ erred by equating minimal daily activities with the ability to sustain full-time work.

3. The decision improperly relied upon incorrect and mischaracterized evidence and testimony and the reasons given to support the denial of benefits are not supported by the evidence.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes and regulations. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot

perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Anderson followed the five-step analytical framework described above. She determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date and that he was insured for DIB through December 31, 2017. She found that plaintiff had severe impairment of degenerative disc disease.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level limited to occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing and stooping; no kneeling, crouching, or crawling; and no work at unprotected heights or around hazardous machinery. Due to medication, he was limited to simple and routine tasks. Based on the testimony of a vocational expert, the ALJ concluded that plaintiff could not do his past work, but he was not disabled because he was able to do other jobs which exist in significant numbers in the national and regional economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1966 and was 46 years old on the alleged date of onset.

(Tr. 244). He said he was disabled because of low back pain, leg pain, right foot pain and numbness, and permanent weight restrictions. He had a high school education. He stopped working on November 12, 2012. He had worked as a body man for auto body repair shops and a car dealer. (Tr. 229-230).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in December 2016. (Tr. 31). Counsel stated that plaintiff had five surgeries on his low back. Dr. Rutz did the recent surgery. Dr. Rutz treated plaintiff under workers' compensation. An MRI done in January 2016 showed stenosis above the level where the surgery had been done. (Tr. 33).

Plaintiff testified that he lived with his wife and two sons, aged 18 and 16. (Tr. 34). He spent most of the day sitting in a recliner. He sometimes did the dishes, but had to take a break while loading the dishwasher because of pain in his right leg. He did not do laundry. He cooked only simple things like frozen pizza or microwave food. His wife did the main grocery shopping. He was able to go to the store and pick up a few things. His only activity was watching his son's wrestling matches. (Tr. 43-45).

Plaintiff said he was unable to work because he had chronic lower back pain. He had pain and numbness in his right foot. If he stood for 15 to 30 minutes, he had burning pain in the front part of his leg. He took Vicodin, Ibuprofen 800, Flexeril, Neurontin, and an antidepressant. (Tr. 38).

A vocational expert (VE) also testified. The ALJ asked her a hypothetical

question which corresponded to the ultimate RFC findings. The VE testified that this person could not do plaintiff's past work, but he could do other jobs such as retail sales, small product assembly, and dining room attendant. (Tr. 48-49).

### 3. Medical Records

Plaintiff saw Dr. Kevin Rutz, an orthopedic spine specialist, in late 2012. In September 2012, Dr. Rutz wrote a letter to MES Solutions summarizing plaintiff's prior treatment and current condition.[3] He noted that plaintiff had two prior microdiskectomy surgeries in the lumbar area, most recently in 1999. He had done fairly well after that, but injured his back at work in July 2011. Since then, he had back pain with radiation into the right thigh and numbness in the right foot. He was still working. Dr. Rutz diagnosed a right L4-5 small recurrent disc herniation on top of lateral recessed stenosis and moderate degenerative disc disease. He recommended a revision right L4-5 microdiskectomy. (Tr. 356-359). In January 2013, Dr. Rutz reported that plaintiff had developed an infection following surgery, but this was resolving with antibiotics. (Tr. 354). In February 2013, Dr. Rutz reported that an MRI showed marked degeneration of the L4-5 disc space consistent with an infectious process and lateral recessed stenosis on the right from scarring and inflammatory tissue. He had significant destruction of the right L4-5 facet joint secondary to infection. The infection was resolved. Plaintiff had significant back and leg pain with increased activities. Dr. Rutz recommended

---

[3] MES Solutions was acting on behalf of the insurance carrier which provided workers' compensation coverage for plaintiff's employer.

a revision decompression and fusion at L4-5 with iliac crest bone graft. (Tr. 352). This surgery was performed in May 2013. (Tr. 412-414).

Following the surgery, plaintiff had physical therapy. Lifting exercises caused an increase in back pain and increasing pain into the anterior right thigh. He stopped therapy for two weeks and was on steroids. This did not improve his pain, so Dr. Rutz ordered a CT Myelogram. The CT Myelogram was performed in September 2013. It showed bridging bone at L4-5 with hardware in good position. He also had mild to moderate lateral recessed stenosis at L3-4. Clinically, he had pain in the low back radiating into the right thigh. Dr. Rutz recommended an epidural steroid injection at L3-4. (Tr. 345-349).

Dr. Andrew Wayne administered the steroid injection on September 26, 2013. His exam showed that plaintiff had a slow gait and markedly restricted flexion and extension of the lumbar spine. He had diffuse tenderness in the lower back and diminished sensation in the right thigh. (Tr. 344).

In October 2013, Dr. Rutz reported to the workers' compensation insurance company that the injection did not relieve plaintiff's pain. He recommended more physical therapy. In November 2013, based on a vocational capacity evaluation performed by another provider, Dr. Rutz concluded that plaintiff had permanent restrictions of regularly lifting 20 pounds and no lifting over 50 pounds. Clinically, he still had pain in his back with some radiation into the right thigh. Dr. Rutz was unable to identify any pathology to clearly account for those symptoms. He was at maximum medical improvement. (Tr. 340-343).

In September 2014, Dr. David Volarich performed an independent medical exam at the request of plaintiff's workers' compensation attorney. He reviewed medical records and examined plaintiff. On exam, he noted that plaintiff walked forward-flexed about 5 to 10 degrees. He was able to toe walk, heel walk and tandem walk. Walking across the exam room 4 or 5 times caused burning discomfort in the right thigh. Straight leg raising caused pain at 60 degrees on the left and 45 degrees on the right. Range of motion of the lumbar spine was limited. As is relevant here, Dr. Volarich diagnosed persistent right leg radiculopathy and post-laminectomy syndrome. He concluded that plaintiff could occasionally lift up to 20 pounds and should not handle weight over his head or away from his body. He should avoid bending, twisting, lifting, pushing, pulling, carrying, and climbing. He should not remain in a fixed position longer than 30 to 45 minutes at a time, and should change positions frequently. (Tr. 477-490).

Plaintiff was seen by his primary care physician, Dr. Ramos-Pardo, in February 2015. He complained of back and leg pain. She noted that workers' comp would not pay for pain management. He said that most days his pain was at level 3, but if he did any activity it worsened in the mid to lower back and he felt spasms if he laid flat. On exam, straight leg raising was positive at 45 degrees on both sides. There was some weakness in the right lower extremity. Dr. Ramos-Pardo diagnosed chronic low back pain and post-laminectomy syndrome. She recommended that he try Vicodin in place of Percocet. (Tr. 501-505). In August 2015, he told her that his pain was currently at level 5, but it escalated to

nearly 10/10 on some days.  (Tr. 498).

Plaintiff returned to Dr. Rutz in January 2016 for pain in the low back and right foot.  On exam, he had decreased range of motion of the lumbar spine secondary to pain.  He had tenderness to palpation in the lumbar paraspinal muscles.  Dr. Rutz noted that plaintiff had been at a higher functional level when he was previously released from his care.  He suspected that his symptoms were from degeneration at a level adjacent to the fusion.  He ordered an MRI.  (Tr. 513-515).  Plaintiff returned to Dr. Rutz on January 4, 2016.  The MRI showed moderate disc degeneration with modic changes at L3-4 as well as mild to moderate right lateral recessed stenosis.  Clinically, plaintiff had pain in the back with radiation into his right anterior thigh and leg.  Dr. Rutz wrote that "I believe the majority of his current problem is related to degeneration at L3-4 and not his L4-5 level, which was his level of injury."  He went on to say, "With these findings on his MRI, I stand by my previous rating on the patient as far as the concern with his initial work injury.  His primary problem now is degeneration at L3-4 which is a separate problem than his initial injury of a disc herniation at L4-5. . . . His limitations and his ability to work are related to, in my opinion, the degeneration at L3-4.  At the time I released him he was capable of working with a 50 pound lifting restriction and I would not change my restriction rating.  At this point, as far as the work injury is concerned his current abilities by his report that are decreased beyond this, are secondary to his own degeneration above his fusion."  (Tr. 511-512).

Dr. Volarich evaluated plaintiff again in July 2016.  On exam, he had

weakness in both hip girdles because of radiating back pain. Sensory exam was normal. He walked in a more forward-flexed position than he had on the previous exam. Range of motion of the lumbar spine was limited. Flexion and side bending were worse than they had been had on the previous exam. There was pain on palpation in the SI joints. Trigger points were found in the right SI joint and, to a lesser degree, at the SI notch. Straight leg raising was positive on the right at 25 degrees and on the left at 35 degrees. Dr. Volarich diagnosed post-laminectomy syndrome with adjacent level breakdown at L3-4. (Tr. 536-545).

4. **State Agency Consultants' Opinions**

A state agency consultant assessed plaintiff's RFC based on a review of the records in January 2014. He concluded that plaintiff was able to do light work, including sitting for 6 hours and standing/walking for 6 hours, with some postural limitations. (Tr. 55-57). A second state agency consultant essentially concurred in September 2014. (Tr. 66-68).

## Analysis

In his third point, plaintiff argues that the ALJ relied on a selective and partially erroneous summary of the medical evidence. He is correct.

First, the ALJ concluded at Tr. 20 that surgery was "generally successful in relieving the symptoms." She relied in part on her perception that, in July 2016, plaintiff told his doctor that his pain was at a level 3 out of 10 on most days. That was an incorrect reading of the records.

Plaintiff did tell Dr. Ramos-Pardo that his pain was at level 3 on most days, but he made that statement in February 2015, not July 2016. The header at the top of all of Dr. Ramos-Pardos' notes bears a date in July 2016; that is the date on which the records were printed, not the date of the treatment. See, Tr. 501-505. Further, in August 2015, plaintiff told Dr. Ramos-Pardo that his pain was currently at a level 5, but it escalated to a level 10 on some days. (Tr. 498). The ALJ ignored that note.

The ALJ said that there was "no pathology to account for his alleged back pain radiation to the right thigh as testing found only mild stenosis above his fusion." She cited to Dr. Rutz' letter of November 14, 2013, for that conclusion. However, the ALJ completely failed to mention the 2016 visits with Dr. Rutz, whom she incorrectly refers to as "Dr. Ruth."

In 2016, after examining plaintiff and reviewing a recent MRI, Dr. Rutz wrote that "I believe the majority of his current problem is related to degeneration at L3-4 and not his L4-5 level, which was his level of injury." He also stated, "His limitations and his ability to work are related to, in my opinion, the degeneration at L3-4." (Tr. 511-512). It is not correct to suggest that Dr. Rutz said that there was no pathology to support plaintiff's complaints. On the contrary, Dr. Rutz was quite clear that he believed that plaintiff's complaints were related to the degeneration at L3-4 as shown on the MRI.

Lastly, the ALJ completely ignored Dr. Volarich's second exam in July 2016. The ALJ pointed out that there was negative straight leg raising on an exam in

January 2016, but ignored the fact that Dr. Volarich found positive straight leg raising in July 2016. In addition, she completely ignored the diagnosis of post-laminectomy syndrome found by both Dr. Volarich and Dr. Ramos-Pardo.[4]

While it is true that an ALJ is not required to discuss every piece of evidence in the record, it is well-established that an ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014), collecting cases. The ALJ's selective and inaccurate review of the medical evidence requires remand.

In his first point, plaintiff argues that the ALJ erred weighing the medical opinions. This error flows from her faulty review and understanding of the medical evidence.

As was noted above, the ALJ incorrectly concluded that Dr. Rutz thought that plaintiff's symptoms could not be explained by any pathology. On the contrary, Dr. Rutz was clear that, in his opinion, plaintiff's complaints were related to the pathology at L3-4. He was equally clear in January 2016 that his opinion related to the effects of plaintiff's work-related injury at L4-5. Dr. Rutz treated plaintiff under the employer's workers' compensation insurance, and he opined as to plaintiff's condition in that context. In January 2016, he wrote, "With these findings on his MRI, I stand by my previous rating on the patient *as far as the*

---

[4] "Post-laminectomy syndrome is a condition where the patient suffers from persistent pain in the back following surgery to the back." Post-laminectomy syndrome is also called failed back surgery syndrome. See, http://neurosurgicalassociatespc.com/post-laminectomy-syndrome/, visited on September 21, 2018.

*concern with his initial work injury*. His primary problem now is degeneration at L3-4 which is a separate problem than his initial injury of a disc herniation at L4-5. . . . . . At this point, *as far as the work injury is concerned* his current abilities by his report that are decreased beyond this, are secondary to his own degeneration above his fusion." (Tr. 511-512)(emphasis added). The ALJ's failure to consider the 2016 visits and the context in which Dr. Rutz opined as to plaintiff's RFC undermines her weighing of his opinion.

In addition, the ALJ completely ignored the 2016 exam by Dr. Volarich in assessing his opinion. And, she gave great weight to the state agency consultants' opinions, but those doctors reviewed the record in 2014, before the 2016 MRI and notes by Drs. Rutz and Volarich. This was error. *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018). See also, *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018).

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. The Court must conclude that ALJ Anderson failed to build the requisite logical bridge here. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during

the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATE:   September 21, 2018.


s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**